UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| CHRISTOPHER E. YOUNG, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 13-1332 |
| LT. TODD PUNKE et. al., | ) |
| Defendants. | ) |

## O R D E R

On October 2, 2017, and continuing through October 4, 2017, this matter came before the Court for a bench trial on Plaintiff Christopher Young's ("Young" or "Plaintiff") claims against Defendant Andrew Tilden, M.D. ("Tilden"), Paul Blackwell ("Blackwell"), Clint Ramsey ("Ramsey"), Robert Rapp ("Rapp"), Kristina Skeens ("Skeens"), and Jeff Stahl ("Stahl"). Prior to the presentation of evidence, Young dismissed his Excessive Force and Deliberate Indifference claims against Defendants Skeens, Stahl, and Ramsey related to the October 9, 2012, incident described below. As such, those Defendants and claims were dismissed with prejudice. Moreover, after the close of the Plaintiff's evidence, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, this Court directed a verdict in favor of Defendant Blackwell, and against Young on his First Amendment claim related to the August 6, 2012, incident described below.

At the end of the trial, the Court found in favor of Defendant Rapp on Plaintiff's Eighth and Fourteenth Amendment claims for failure to provide medical attention and deliberate indifference claims related to an August 6, 2012, incident. The Court deferred ruling on Plaintiff's Eighth and Fourteenth Amendment claims against Defendant Tilden for failure to provide medical attention. Subsequently, during the Status Conference held on October 11, 2017, this Court

1

announced that it would be entering a ruling in favor of Plaintiff, and against Defendant Tilden on the claims of deliberate indifference for failing to provide proper medical attention. (Minute Entry dated 10/11/2017). The Court further explained that its rulings would not be final until the Court entered its written order. This Order is intended to provide the Court's Finding of Facts and Conclusions of Law as required under Rule 52(a) of the Federal Rules of Civil Procedure.

## OVERVIEW[1]

Young is an inmate in the custody of the Illinois Department of Corrections ("IDOC"), and is currently housed at Statesville Correctional Center. During the relevant time period, Plaintiff was housed at Pontiac Correctional Center. Defendant Tilden is a licensed physician, and has been employed as the medical doctor at Pontiac Correctional Center since November of 2010. Plaintiff was under the medical care of Defendant Tilden while he was housed at Pontiac Correctional Center. In 1987, prior to being incarcerated, Plaintiff was involved in an automobile accident. As a result of the accident, Plaintiff had two neck surgeries in the mid-1990s. Thereafter, Plaintiff had chronic neck pain. The surgeon indicated to Plaintiff that he would continue to have problems with his neck even after the surgeries. Plaintiff's claims against Defendant Tilden center on the medical treatment he received during his incarceration at Pontiac Correctional Center.

Defendants Blackwell and Rapp were employed by the IDOC at Pontiac Correctional Center during the timeframe relevant to Plaintiff's claims. On August 6, 2012, Plaintiff received a Disciplinary Ticket that charged him with the offense of "206 Intimidation or Threats." The Disciplinary Report noted Plaintiff stated to staff members that: "[i]f I stay in this cell y'all gonna have to come get me, I'm trying to avoid a fight." Defendant Blackwell was the author of the Disciplinary Report.

---

[1] Statements contained herein are uncontested issues of fact unless otherwise noted. (*See* ECF No. 105, Pre-Trial Order Uncontested Issues of Fact).

2

On that same day, Plaintiff claims he was removed from his cell, and that once removed, he was placed in Cell 114, a cell he alleges lacked adequate ventilation. At trial, Plaintiff testified the outside temperatures on August 6, 2012, was around ninety degrees. Plaintiff claims he suffered an asthma attack, and further claims Defendant Rapp refused his request for medical treatment and instead left the correctional facility at 3:00 p.m., leaving Plaintiff in distress. Plaintiff testified he passed out and remained on the floor until the next day. The Defendant claims Plaintiff's medical records show he was evaluated by the medical staff at 5:00 P.M. that day, and there was no unreasonable delay in his care.

## STANDARD OF REVIEW

Rule 52 of the Federal Rules of Civil Procedure governs a proceeding in which the court, rather than a jury, "find[s] the facts specially" and makes conclusions of law. Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." All Parties consented to a bench trial. (*See* ECF No. 91).

Additionally, during a bench trial, the Court may make judgment on partial findings after a party has been fully heard on an issue. Rule 52(c) of the Federal Rules of Civil Procedure provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

I. **August 6, 2012 Retaliation Claim**

Plaintiff claims that Blackwell wrote him a disciplinary ticket in retaliation for reporting a potential fight between him and his cellmate. It is undisputed that Plaintiff told Blackwell "[i]f I stay in this cell y'all gonna have to come get me, I'm trying to avoid a fight." The dispute between the Parties is over the meaning of the statement and tone used by the Plaintiff while making the statement. The following is a summary of the various testimony at trial related to this incident.

Paul Blackwell

Blackwell testified that when Plaintiff said "[i]f I stay in this cell y'all gonna have to come get me, I'm trying to avoid a fight," he appeared agitated and aggressive. Blackwell testified that when he encountered the Plaintiff, he deemed him to be agitated and aggressive because of his mannerisms, tone of voice, and his overall experience dealing with inmates. Blackwell also testified that, while making the statement, Young was packing his property on his bed. Blackwell testified, in his experience, this type of action on the part of an inmate was indicative that the inmate was preparing or expecting to be moved. Blackwell testified that he interpreted Plaintiff's statement as a threat directed towards his cellmate. He also testified the cellmate was standing on the opposite side of the cell against the wall silently with his arms crossed. In the situation, Blackwell testified he believed time was of the essence and immediately called Lieutenant Punke to the cell over the radio. Blackwell stated that Lieutenant Punke made the decision to place Young in Cell 114.

Christopher Young

Young admitted that he said to Blackwell "[i]f I stay in this cell y'all gonna have to come get me, I'm trying to avoid a fight" but testified that he was not agitated, and he was just packing

4

his property on his bed. He testified he was trying to explain to Blackwell that he was verbally threatened by his roommate and was trying to avoid a fight.

Findings of Fact and Conclusion of Law

In order for Plaintiff to prevail, he must show that: (1) "he engaged in activity protected by the First Amendment" (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) "the First Amendment activity was 'at least a motivating factor' in the Defendant's motivating decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F 3d. 46 (7th Cir. 2009). Based on the record before it, the Court finds that Defendant Blackwell did not violate the First Amendment in retaliating against Plaintiff.

As noted above, at the close of Plaintiff's evidence the Court entered judgment for the Defendant pursuant to Federal Rule 52(c). Based on the evidence presented during Plaintiff's case-in-chief, the Court finds Plaintiff is unable to show that his statement rises to the level of speech protected by the First Amendment. In fact, based on the record evidence, the Court finds Defendant Blackwell's overall assessment of the situation to be reasonable.

The Court finds the testimony of Blackwell to be extremely credible. It should be noted that Young's testimony did contradict Blackwell's for the most part. In fact, both witnesses testified that the above-noted statement was said and Plaintiff was packing his belongings. Moreover, both witnesses testified that they believed physical violence was possible in this situation. Where the Parties differ is whether or not Plaintiff was the one who was prepared to start the fight. In that regard, the Court finds Defendant Blackwell's testimony more credible. At the time of the incident, Blackwell had over a decade of experience serving as a correctional officer. There is no dispute that the situation was one where time was of the essence and something needed to be done quickly to deescalate the situation. The Court finds, based on all of the facts,

that it was reasonable for Blackwell have Young removed from the cell because he thought Young had made a threat to his cellmate's safety. The record does not support a finding Defendant Blackwell was acting in retaliation when he ticketed Plaintiff for intimidation and threats. Indeed, as noted above, it was quite the contrary. As such, Plaintiff cannot succeed on his claim. Judgment must be, and is, granted in favor of Defendant Blackwell.

**II.     August 6, 2012, Failure to Provide Medical Attention Claim against Defendant Rapp**

Plaintiff claims that Rapp did not take measures to provide him adequate medical attention when he was having an asthma attack after he was moved to Cell 114. Almost all of the facts surrounding the incident are disputed.

Robert Rapp's Testimony

Rapp admitted that he was involved in moving Young to segregation on the afternoon of August 6, 2012. Rapp testified that Young requested medical assistance later that day, and Rapp testified that he told his sergeant of Young's request. Rapp stated that at that time Young was well enough to speak and was not laying on the ground. On cross, Rapp was asked if he recalled Plaintiff asking for his inhaler, and Rapp testified he did not remember Plaintiff asking for it. Since Plaintiff was moved to segregation that day he had not received all his property including his inhaler. Rapp testified he did not have the authority to bring an inmate to the Health Care Unit, and in an emergency, would call his sergeant or call for a "Code 3" medical emergency. Rapp detailed that correctional officers do cell checks every thirty minutes and two rollcall checks during each shift, with the exception of the night shift. Rapp testified that he did not have any training on asthma protocols or any knowledge of the effect of heat on asthma patients.

Christopher Young's Testimony

Young testified that he began to have trouble breathing ten minutes after being moved into Cell 114. At that time, Young testified he asked Rapp for assistance. On cross, Young acknowledged that in a previous deposition he testified to a different timeframe, noting that he could have started having troubles breathing a few hours after being put in the new cell. Young, however, explained that the conflicting reports were due to him being under stress. When asked what happened to Rapp after he asked him for help, Plaintiff testified he did not know because he could not see behind the door. Plaintiff testified it was so hot in the cell that he could not breathe. Plaintiff also testified he was not given ice – which is typically done on hot days - because the guards had passed by before he was moved into the new cell. Young testified he passed out after his asthma attack in the early afternoon and did not wake up until the next day and spent all of the time passed out on the floor. On cross examination, Young was questioned about whether he had been seen by the medical staff at 5:15 P.M. on August 6, 2012, but he had no memory of receiving a breathing treatment that was recorded in his medical records at Pontiac. Plaintiff also testified to various, approximately six, other asthma attacks he had at Pontiac prior to August 6, 2012, where he was escorted to the Urgent Care Unit.

Dr. Andrew Tilden's Testimony

Dr. Tilden as the Medical Director of the Medical Unit was used to introduce various medical records in the Plaintiff's file. One of those records he read while on the stand was from August 6, 2012. Dr. Tilden detailed an "Offender Outpatient Progress Note" where a nurse listed her notes after providing Plaintiff with a breathing treatment at 5:15 P.M. on August 6, 2012.

7

Court's Findings of Fact and Conclusions of Law

Based on the record before it, the Court finds that Defendant Rapp was not deliberately indifferent to a serious medical need of the Plaintiff in violation of his Eight Amendment rights. Eighth Amendment principles prohibit correctional officers from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 104-05 (1976). An inadequate medical care claim requires the plaintiff to fulfill two elements: (1) that the inmate suffers from an objectively serious medical need, and (2) that the prison official knew of and disregarded an excessive risk to inmate health. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Whether a prison official was deliberately indifferent to a serious medical need of a prisoner requires both an objective and subjective element. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). In the medical care context, the objective element requires that the plaintiff's medical need be "sufficiently serious." *Id.* The subjective element requires that the officials act with a sufficiently culpable state of mind. *Id.* While the objective element requires a plaintiff's medical need to be sufficiently serious, courts have explained that not every injury or deprivation suffered by a person in custody translates into constitutional liability for prison officials responsible for the prisoner's health and well-being. *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999).

The biggest issue highlighted by the testimony of the witnesses is the timing of the events. The Court, having fully considered the testimony, finds that Young did experience an asthma attack on August 6, 2012. Nonetheless, the Court finds Plaintiff's testimony on this issue is significantly unreliable. Simply put, his testimony is not credible. First, the Court finds that Plaintiff was given a breathing treatment on the day in question. The medical record fully supports this conclusion. As such, Plaintiff's testimony that he was passed out on the cell floor all night is

not credible. Plaintiff's lack of credibility also leads this Court to believe he is exaggerating the seriousness of the situation. In addition, the Court also finds that due to the fact Plaintiff could speak and was not in severe distress, Plaintiff was given appropriate care. Since Plaintiff received treatment, Rapp appears to have follow proper protocol – or at least some protocol - and got his superior to follow up on Young's request for medical assistance. Given these findings, the Court finds Plaintiff is unable to prove his case of failure to provide medical care against Defendant Rapp. Accordingly, judgment is entered in favor of Defendant Rapp.

### III. <u>Failure to Provide Medical Attention Claim against Defendant Tilden</u>

As previously noted, prior to being incarcerated with the Illinois Department of Corrections, Plaintiff was involved in a serious automobile accident. As a result of the automobile accident, Plaintiff had surgeries on his neck in the mid-1990s. Plaintiff alleges that Defendant Tilden was deliberately indifferent to his serious medical needs related to neck and back while Plaintiff was an inmate in Pontiac Correctional Institution in violation of Plaintiff's constitutional rights.

<u>Dr. Andrew Tilden's Testimony</u>

Defendant Tilden is a licensed physician with over 30 years of experience and is the Medical Director at the Pontiac Correctional Center. The Defendant said his experience included treating at least one hundred patients with neck and back issues similar to the Plaintiff. While incarcerated at Pontiac Correctional Center between June 2012 to June 2014, Plaintiff was seen by Tilden for various conditions including his chronic neck and back pain.

Tilden testified the decision to send an inmate out for specialty services, including ordering an MRI and a CT scan, was within the sole authority of the medical director. Young received an x-ray at Pontiac Correctional Center because that service could be performed without a specialty

referral. Young was never sent out for a MRI or CT Scan. As it relates directly to Plaintiff's claim that he should have received additional medical intervention for his neck and back, Defendant Tilden testified that sending a patient for further treatment, including a CT Scan, MRI, and neurology referral, would be appropriate when there was "unilateral weakness," "sensory deficits," and "other findings." While on the stand the Defendant explained how stenosis or the narrowing of the spinal cord can cause tingling and numbness in a person's hands and arms which would be subjective symptoms of sensory deficits. He then went on to say that if a patient complained of such symptoms he would look at the patient's medical records and do a physical exam. Tilden testified that, in his medical judgment, such interventions were not clinically indicated for Plaintiff based on his specific findings.

*Medical Records*

During his testimony, Tilden spoke about the various other visits he had with Plaintiff and went through the voluminous medical records (progress notes) that were entered into evidence. He said that Young's prior history included degenerative joint disease in his back and neck and that he had degenerative disk disease in C5 and C6. Tilden first saw Young in the urgent care, on June 18, 2012, for acute respiratory distress. Tilden first proscribed Naprosyn, an anti-inflammatory drug, and Baclofen, a muscle relaxer to address his pain and he continued on this regime for five months. In addition to medication, the Plaintiff was continuously proscribed "low bunk" and "low gallery" permits but was consistently denied a back brace which he had at previous correctional centers and once he moved to Statesville.

The progress note dated August 16, 2012 states that Young had complained about pain in the right upper extremity. Tilden testified that type of pain is the same kind of neuropathic pain that would dictate sending a patient to a specialist for further treatment. On July 22, 2013, Young

10

complained to Tilden that his pain was so severe he was having trouble sleeping through the night. Tilden then proscribed him Prednisone, anti-inflammatory for one month. By September 28, 2013, the progress note said Young was back in sick call reporting that the pain was worsening and that the medicine was no longer effective in treating his pain. An October 2, 2013, note indicated that a physician's assistant discontinued the naproxen and proscribed Plaintiff with Motrin for his pain. Tilden testified that he saw Young on February 14, 2014, which was thirty-three days after Young had requested sick call for his back pain, but only treated him for a skin condition.

In reviewing the medical records from the witness stand, Tilden noted Young was seen on numerous occasions for conditions not related to his back or neck. During these occasions, Tilden testified that the record lacked any mention by Young of back or neck pain. (*See e.g.* Jt. Ex. 1 at 54, 56, 57, 60, 73, 97, 299, 300, 303, 304, 308, 309, 310, 311, 313, 314, and 315). Notably, Tilden explained that during these visits he was often seen by a different medical professional other than himself. Additionally, Tilden testified that, had Plaintiff complained of neck or back pain during a visit with him, he would have documented that compliant in the medical record. Tilden continued to testify that Young never presented symptoms of nerve pain, "no neuropathic diagnosis" that would require the prescription for gabapentin or require him to be sent to a specialist.

Christopher Young

Plaintiff testified that he has been constantly suffering from back and neck pain. Particularly, when Plaintiff was asked to assess his pain on a scale from one to ten, he testified that, from 2012 to 2014 and during his testimony as well, the pain ranged between 7 and 8. Young also stated that he filed several grievances complaining about his current medical treatment because it was not effective in addressing his suffering. He read through various medical records stating that he complained to various nurses, physician assistants and Tilden himself that he was

11

in pain and that the treatment he was receiving was not working. Plaintiff also testified that he sent letters to the Defendant asking to change his treatment because the current regime was not sufficient. On the other hand, he affirmed that the steroid injections he received from the specialist provided some temporary relief.

On cross examination, Plaintiff was asked about him being seen by the guard doing push-ups in his cell. At first, Young denied he engaged in the activity. Later, he admitted that he actually tried to work out as suggested by the prison medical staff, however, he was never successful due to this pain.

Health Unit Administrator Arroyo

Teresa Arroyo testified that she was the HUA from 2012 to 2015 at Pontiac Correctional Center. She confirmed that as a registered nurse and the HUA, she did not have the authority to issue or renew prescriptions or to refer an offender to a specialist. She testified that Tilden was the only person with the authority to do so.

Arroyo described the medical grievance process. She testified medical grievances were sent from the grievance office to the Health Care Unit where the Office Coordinator, the secretary to both her and Tilden, received all of the grievances. Then the grievances were separated by the HUA. If the grievances were more specific as to treatment, it would be given to Tilden for him to answer. Otherwise, the HUA would handle them herself. Grievances that the HUA used to handle included questions of the offender's medical record, complaints of not being seen by a medical staff, or not being prescribed medicine. She did read into the record one of her responses to a grievance involving a specific question that should have been sent to Tilden. Once she received a grievance that she should handle herself, she would hand write a response to the grievance and the Office Coordinator would type it up for her approval and signature. The signed response would

12

be given to the grievance officer who would give it to the offender. Arroyo testified she had no knowledge of what Tilden did with his grievances and that she never spoke to him about grievances he received.

Arroyo also detailed the mail process for the Health Unit. She said that the mail were screened by the nurses and medical technicians. She testified that Tilden had a mailbox and she had seen him check it in the mornings. Arroyo explained that offenders could send mails through institutional mail or place it in the lock box outside of the Health Unit.

Court's Findings of Fact and Conclusions of Law

"The Eighth Amendment's ban on 'cruel and unusual punishments' requires prison officials to take reasonable measures to guarantee the safety of inmates, including the provision of adequate medical care." *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (*citing Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). An inadequate medical care claim requires a plaintiff to fulfill two elements: (1) the plaintiff "suffered an objectively serious harm that presented a substantial risk to his safety," and (2) "the defendants were deliberately indifferent to that risk." *Minix*, 597 F.3d at 831.

Whether a prison official was deliberately indifferent to a serious medical need of a prisoner requires both an objective and subjective element. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). In the medical care context, the objective element requires that the plaintiff's medical need to be "sufficiently serious." *Id.* The subjective element requires that the officials act with a sufficiently culpable state of mind. *Id.* While the objective element requires a plaintiff's medical need to be sufficiently serious, courts have explained that not every injury or deprivation suffered by a person in custody translates into constitutional liability for prison officials

responsible for the prisoner's health and well-being. *Henderson v. Sheahan*, 196 F.3d 839, 844 (7th Cir. 1999).

The medical condition must be one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gutierrez*, 111 F.3d at 1373. However, there is no requirement that the patient provide "objective" evidence of his pain and suffering. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). In some cases, self-reporting the subjective symptoms is the only indication of a serious medical condition. *Id.* The Seventh Circuit has recognized that at times medical professionals themselves can hinder patients from obtaining objective evidence. *Id.*

In the context of medical professionals, medical malpractice, negligence, or even gross negligence do not equate to deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Indeed, "the Eighth Amendment is not a vehicle for bringing claims for medical malpractice." *Snipes v. DeTella*, 95 F.3d 586, 590-91 (7th Cir. 1996); *Bryant v. Madigan,* 84 F.3d 246, 249 (7th Cir.1996) ("[T]he courts have labored mightily to prevent the transformation of the Eighth Amendment's cruel and unusual punishments clause into a medical malpractice statute for prisoners."). The Seventh Circuit has said that Plaintiff "may recover if he can prove that the clinic personnel deliberately gave him a certain kind of treatment knowing that it was ineffective, either as a means of toying with him or as a way of choosing the 'easier and less efficacious treatment.'" *Kelley v. McGinnis*, 899 F.2d 612, 616 (7th Cir. 1990).

In addition, a plaintiff's mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient to establish deliberate indifference. *Johnson*, 433 F.3d at 1013. Under the professional judgment standard, a "medical professional is entitled to deference in

14

treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).

A plaintiff must show that he was harmed by the defendant's deliberate indifference. The harm element may be satisfied with evidence of pain and suffering. *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012). A "delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). *Estelle v. Gamble*, 429 U.S. 97, at 104–05, 97 S.Ct. 285; *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010); *Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007).

Finally, it should be noted that the Seventh Circuit has found that deliberate indifference is equivalent to criminal recklessness. *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). A finding of deliberate indifferences requires a finding that the defendant knew of a substantial risk and consciously disregarded it. *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

First, the Court finds that Dr. Tilden was on notice that Young was in chronic pain due to his back and neck injury that required more treatment than prescribed. While the medical grievances in the record do not necessarily lend support to Plaintiff's argument that Tilden was on notice, there is additional evidence supporting the conclusion that Tilden was aware that Young was in chronic pain. Parenthetically, at most this Court could assume Dr. Tilden may have seen two medical grievances submitted by Plaintiff. Nonetheless, Plaintiff's medical records contain numerous references that Plaintiff had pain associated with his neck and back.

On several medical requests, Plaintiff specifically noted that he was having pain as well as "numbness in [his] right arm [ ] hand and fingers." (*See e.g*. Pl. Ex. 14, 15, and 16). The Joint

Medical Exhibits also identify numerous occasions where Plaintiff's back and neck pain was specifically referenced. At times, such references were attributed to Plaintiff (*See e.g*. Jt. Ex. At 648), but on numerous occasions it was a references made by the medical provider. (*See* Jt. Ex. 1 at 27, 48, 50, 53, 56, 62). The treatment for Plaintiff's pain began almost immediately upon his arrival at Pontiac Correctional Center. (Jt. Ex. 1 at 10).

Second, Tilden testified himself that additional tests, including a CT scan, MRI, or neurological referral would be appropriate where there was "unilateral weakness," "sensory deficits," and "other findings." Tilden also testified that the doctor at Statesville Correctional Center correctly referred Plaintiff for additional tests – e.g. CT scan, MRI, and referral to neurology department – after treating Plaintiff conservatively, and then when he started complaining about unilateral pain and weakness. However, the record clearly shows Plaintiff complained of the same type of pain and weakness while under Tilden's care. In fact, the medical records specifically reveal Plaintiff complained of numbness as early as September 6, 2012. (Pt. Ex. 14; *see also* Jt. Ex. 1 at 50). Ultimately Plaintiff's complaints resulted in him receiving an x-ray on or around June 25, 2013. (Jt. Ex. 1 at 50-51). The x-ray made an indication of "numbness of the arm." (Jt. Ex. 1 at 229). Finally, prior to and after the x-ray, Plaintiff made complaints of pain. (See e.g. Jt. Ex. 1 at 56).

The Court finds the record is convincing that Plaintiff's complaints were wholly consistent with the parameters Tilden articulated and would result in additional testing and review, yet none was undertaken. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) *citing Snipes v. DeTella,* 95 F.3d 586, 592 (7th Cir.1996) ("[The] receipt of *some* medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' a medical

condition."); *see also Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997). As a result, the Court finds Plaintiff was undertreated and left in pain. Candidly, it appears, at least to this Court, that a referral would have been a simple and effective way to diagnose the Plaintiff's condition. Particularly in a case such as this where Plaintiff consistently complained of pain for a period of almost two years. The Court is in no way attempting to assert its judgment in lieu of Tilden's. Instead, it is Tilden's own testimony that supports a finding that there was a delay in treatment. And this Court finds the delay in treatment is the kind that the Seventh Circuit has recently confirmed is constitutionally deficient. *Hotchkiss v. David*, No. 16-3934, 2017 WL 4964714, at *3 (7th Cir. Nov. 1, 2017).

Finally, the Court finds Defendant's conduct caused harm to Plaintiff. The Court has spent a considerable amount of time considering this element. The record does not support a finding that the Defendant's action resulted in any deterioration of the Plaintiff's back and neck condition. Specifically, there was no evidence at trial that any surgery is recommended at this time, nor was there sufficient evidence that the Plaintiff's conditions worsened as a result of not being seen by a specialist sooner. But, there is evidence in this record that Plaintiff received some temporary relief from pain as result of the epidural steroid injections. It should be stressed that this relief was temporary, and Plaintiff testified that his pain level is essential the same today as it was while he was under Defendant Tilden's care. Nevertheless, the failure to send Plaintiff to a specialist and to pursue the same ineffective course of treatment resulted in some, albeit limited, additional pain to the Plaintiff.

Having fully considered the record, the Court finds Plaintiff is entitled to damages in the amount of $2000 for pain and suffering plus an additional $55, which represents this Court's

estimation of the total Plaintiff paid for co-pays related to his back and neck appointments while at Pontiac Correctional Center.

## CONCLUSION

Pursuant to its obligation under Rule 52 of the Federal Rules of Civil Procedure, the Court, having considered all the evidence and assigning such weight as the Court believes it is entitled to receive, finds, and the Clerk of the Court is DIRECTED to enter judgment, as follows:

> In favor of Defendant Paul Blackwell, and against Plaintiff Christopher Young, on Plaintiff's First Amendment claim related to an August 6, 2012, incident;
>
> In favor of Defendant Robert Rapp, and against Plaintiff Christopher Young, on Plaintiff's Failure to Provide Medical Attention Claim related to an August 6, 2012, incident; and
>
> In favor of Plaintiff Christopher Young, and against Defendant Andrew Tilden, M.D., on Plaintiff's claim of deliberate indifference related to his medical treatment for his back and neck.
>
> Plaintiff is entitled to damages in the amount of $2055 for pain and suffering and medical appointments.

ENTERED this 20th day of December 2017.

                                                                       /s/ Michael M. Mihm
                                                                            Michael M. Mihm
                                                                       U.S. District Court Judge